1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    SHAWNA BROWN, individually and as          No. 2:13-cv-01007-KJM-KJN
      successor-in-interest for Decedent
12    LUTHER BROWN; A.B., a minor, by and        ORDER
      through her guardian ad litem, SHAWNA
13    BROWN; D.P., a minor, by and through
      her guardian ad litem, RITA
14    ALMENDAREZ; A.B., a minor, by and
      through her guardian ad litem, RITA
15    ALMENDAREZ; D.P., a minor, by and
      through his guardian ad litem, RITA
16    ALMENDAREZ; S.S.J., a minor, by and
      through her guardian ad litem, GAYLE
17    JOHNSON; and QUEEN E. BROWN,
      individually,
18
                      Plaintiffs,
19
              v.
20
      WESLEY GRINDER, individually; RYAN
21    TAIARIOL, individually; LOREEN
      GAMBOA, individually; 'FNU' SCOTT,
22    individually; and DOES 1–50, inclusive,

23                    Defendants.

24

25                    On April 6, 2012, defendants Stockton Police Officers Wesley Grinder and Ryan

26    Taiariol stopped a car driven by plaintiffs' decedent, Luther Brown.  Brown, who was on

27    searchable probation, submitted to a search of his person and then fled on foot before officers

28    could search his car.  Defendants pursued Brown.  A struggle ensued, which ended with Grinder

                                                 1

shooting Brown to death.  *See* First Am. Compl. (FAC) ¶¶ 1, 18-19, ECF No. 29.  Plaintiffs, relatives of Brown, sue under 42 U.S.C. § 1983, alleging excessive force in violation of the Fourth Amendment, violation of plaintiffs' rights to familial relationship under the Fourteenth Amendment, and state law claims.  *Id.* ¶¶ 31-49.  Defendants move for summary judgment on all of plaintiffs' claims, including plaintiffs' request for punitive damages.  Mot. Summ. J. (Mot.), ECF No. 69-2.  For the reasons stated below, defendants' motion is DENIED, with the clarification that plaintiff Queen E. Brown proceeds only on her Fourteenth Amendment substantive due process claim of deprivation of familial association.

I.       BACKGROUND

      A.       Disputed and Undisputed Facts

           The following facts derive from both parties' statements of undisputed facts, the parties' responses to those statements, evidence cited in those statements, and the court's review of the record.  *See* Defs.' Reply re: Undisputed Facts (DF), ECF No. 78-1;[1] Defs.' Resp. to Pls.' Undisputed Facts (PF),[2] ECF No. 78-2.  The court notes and resolves evidentiary objections below and otherwise to the extent necessary as they arise.

         1.       Evidentiary Objections

             a.       Defendants' Objections to Deposition Testimony

           Defendants object to plaintiffs' reliance on the depositions of Grinder, Taiariol, Velazquez and Looney based on plaintiffs' identifying only page numbers, without pinpoint line cites.  Objs. at 2–6, ECF No. 78-3.  Defendants cite *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 775 (9th Cir. 2002), in which the court held "that when a party relies on deposition

---

[1] Defendants' reply does not include plaintiffs' full response to each disputed fact. *Compare* ECF No. 70-1 at 18 (plaintiffs' response disputing defendants' fact 48*), and* ECF No. 78-1 at 27 (defendants' reply to plaintiffs' response to fact 48 omitting multiple grounds for plaintiffs' disputing that fact).  The court has reviewed plaintiffs' responses separately.

[2] Because several of defendants' responses to plaintiffs' separate statement of undisputed material facts misidentify or omit plaintiffs' fact numbers, the court's citations to PF correspond to the fact numbers identified in plaintiffs' separate statement of undisputed material facts, ECF No. 70-2.

testimony in a summary judgment motion without citing to page and line numbers, the trial court may in its discretion exclude the evidence." Although plaintiffs have not provided line numbers on the deposition pages they cite, the court finds plaintiffs' page citations in this circumstance enable the court to readily find the relevant testimony and thus avoid the need to "paw over the files without assistance from the parties." *See Huey v. UPS, Inc.,* 165 F.3d 1084, 1085 (7th Cir. 1999). The court declines to exclude this evidence on these grounds.

Defendants also object to the entirety of the deposition testimony of Velazquez and Looney, asserting that this testimony "should be disregarded as implausible and not sufficiently reliable for this Court to consider on summary judgment." Objs. at 3–8. Although defendants cite some conflicts in the deposition testimony when compared to the video evidence and other facts of record, these are the kinds of conflicts amenable to a factfinder's determinations of the credibility of Velazquez and Looney and the weight assigned to their testimony. The court will not exclude the entirety of Velazquez and Looney's testimony. *See Lam v. City of San Jose*, 869 F.3d 1077, 1085 (9th Cir. 2017) (affirming district court's conclusion "that the jury was entitled to give [the witness's] testimony weight" despite acknowledging that witness's testimony "could not, in some respects, be reconciled with the physical or documentary evidence").

Defendants' last objection to the deposition testimony of Velazquez and Looney focuses on deposition pages filed with the court but not cited in plaintiffs' opposition. Objs. at 5, 6, 8–9. The court has discretion to review all deposition excerpts provided by the parties rather than limiting its review to the specific excerpts the parties cite. *See Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("[T]he district court may determine whether there is a genuine issue of fact, on summary judgment, based on the papers submitted on the motion and such other papers as may be on file and specifically referred to and facts therein set forth in the motion papers"; court also "has discretion in appropriate circumstances to consider other materials" though "it need not do so"); *cf. Orr*, 285 F.3d at 775 (discretion to exclude deposition testimony without citation to page and line numbers). Accordingly, the court need not exclude portions of deposition transcripts not cited in plaintiffs' brief. To the extent defendants

3

complain the uncited portions are irrelevant, a court "cannot rely on irrelevant facts [in deciding a summary judgment motion], and thus relevance objections [to evidence] are redundant." *See Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).

b.      Defendant's Objections to Exhibits

Defendants raise multiple objections to Exhibits E and F to plaintiffs' declaration provided in opposition to summary judgment. Objs. at 9–12. Where plaintiffs do not cite these exhibits in their briefing, the court does not rely on them in considering the parties' arguments, given plaintiffs' failure to "cit[e] to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). One exhibit plaintiffs do reference but only in passing without meaningful explanation, and which the court does not consider, is Roger Clark's expert report, Exhibit F. *See* Opp'n Mot. Summ. J. (Opp'n), ECF No. 70,[3] at 19:19–24 (citing Nisenbaum Decl., Ex. F (Clark Report), ECF No. 71-6).

Plaintiffs cite to only two portions of the materials provided in Exhibit E, referring to an Officer Involved Shooting (OIS) Report and the San Joaquin County Coroner's Report. First, plaintiffs cite one page from the OIS Report in support of the proposition that "Grinder did not tell OIS investigators that Mr. Brown took a fighting stance during his interview hours after shooting, and Defendant Taiariol testified that when Mr. Brown was able to stand he turned to the south away from the officers as though to retreat." *See* Opp'n at 9 (citing Nisenbaum Decl., Ex. A (Grinder Dep.), ECF No. 71-1, at 121, 129; Nisenbaum Decl., Ex. E (OIS Report), ECF No. 71-5, at 217); [4] Nisenbaum Decl., Ex. B (Taiariol Dep.), ECF No. 71-2, at 82-83). Second, plaintiffs cite multiple pages of a "Coroner's Report" as support for the proposition that Grinder "shot [Brown] nine times causing Mr. Brown to die." *Id.* (citing Nisenbaum Decl., Ex. E (Coroner's Report), ECF No. 75-5, at 10-14, 17). Defendants do not object specifically to the

---

[3] Plaintiffs filed an amended opposition and amended response to "correct an error in the alignment of the Table of Contents in Plaintiffs' [earlier filed] Opposition" and "to correct omissions that occurred . . . in responses [to DF] Nos. 5, 6, 7, 8, and 28 . . . ." ECF Nos. 72 at 2 & 72-1 at 2.

[4] Unless exhibits are clearly individually paginated, as with deposition transcripts, the court refers to the ECF page numbers.

court's reliance on the pages of the Coroner's Report, but do object to all of Exhibit E because it "[l]acks foundation, is speculative and not based on personal knowledge," lacks "authentication or foundation," and the documents are hearsay, and reflect multiple levels of hearsay. Objs. at 9. Defendants object specifically to the OIS Report on those grounds. Objs. at 12. Yet as noted above, the court may consider evidence that will be "admissible at trial," *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003), a status depending not on the form of evidence, but on its content. *Block v. City of L.A.*, 253 F.3d 410, 418–19 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Defendants fail to explain why plaintiffs could not admit these two documents at trial through an authoring witness. The court exercises its discretion in declining to exclude this evidence.

### 2.      Undisputed Facts

On April 6, 2012, defendants Grinder and Taiariol were working together on duty as police officers employed by the City of Stockton. DF 1, 2. Grinder was driving a marked Stockton Police Department patrol car. DF 5. Grinder and Taiariol initiated a traffic stop of a vehicle that lacked a front license plate in violation of California Vehicle Code section 5200. DF 4–5; PF 11. Decedent Brown was driving that vehicle. DF 8. Grinder approached the driver's side of the vehicle, and Taiariol approached the passenger's side. DF 7. Grinder obtained Brown's driver identification and asked Brown if he was on probation or parole. DF 8-9. According to Grinder, Brown responded by stating he was on probation for "domestic." DF 10. After confirming that Brown was on searchable probation, Grinder asked Brown to step out of the vehicle to initiate a search of Brown and Brown's vehicle. DF 11–12. Grinder's search of Brown's person revealed no weapons. DF 13; PF 14.

Grinder then asked Brown to walk to the curb so the officers could search Brown's car. DF 14. Brown began walking toward the curb where Taiariol stood, but then suddenly ran away from Taiariol. *See* DF 15. Taiariol ran after Brown on foot. DF 16. Brown continued running away from Taiariol, cutting through nearby yards. DF 19. Brown then attempted to scale a fence between two duplex residences. DF 20. Taiariol grabbed Brown as he attempted to scale the fence, and began to struggle with Brown. DF 21, 23. Taiariol tried to control Brown, but

Brown pulled away.  DF 25.  At some point, while trying unsuccessfully to gain control of Brown, Taiariol punched Brown in the face about five to six times; he also hit Brown with both hands and with his baton.  DF 27-29; PF 8.

During the chase, Grinder drove the patrol car into the front yard of one of the duplexes, where Taiariol and Brown were struggling.  DF 30.  When Grinder arrived, Brown was on the ground and Taiariol was trying to take him into custody.  DF 31.  Taiariol was grabbing Brown's arms and trying to prevent him from escaping.  DF 32.  Meanwhile, face down on the ground, Brown was "throwing elbows" and "squirming."  PF 17.  Brown hit Taiariol with his elbows.  PF 16.  Grinder tried to control Brown by putting Brown's hands behind his back.  DF 35.  He then hit Brown seven to eight times with his baton, breaking Brown's right arm.  DF 37, PF 10.  At some point after the officers struck Brown with their batons, both officers heard Brown ask, "Why are you hitting me?"  PF 7, Taiariol Dep. at 56:18-24; Grinder Dep. at 101:19-23.

Taiariol testified that during the struggle he tried unsuccessfully to use a carotid restraint on Brown.  DF 38.  He explained that a carotid restraint is performed by "put[ting] one arm over the front of [a person's] body, with the V . . . of the elbow under the neck area, so that you have the bicep on one side of the carotid, and [] the forearm wrist area on the other carotid . . . .  And then you lock the other hand and then you apply pressure . . . . with the bicep and wrist forearm on the sides of the neck."  Berry Decl., Ex. B, (Taiariol Dep.), ECF No. 69-3, at 78:4-16.  Taiariol also testified that he started to push his arm along the right side of Brown's neck and bring his forearm around to the left side, but he did not "recall getting the lock."  *Id*. at 78:22-25.  Neither Grinder nor Taiariol possessed tasers, and the parties agree that "OC spray"[5] would have been inappropriate in this situation "because officers are discouraged from using OC spray in close-combat situations."  DF 43–44.

---

[5] Although neither party defines "OC spray," that term is defined as "oleoresin capsicum aerosol ('OC' or 'pepper spray')" in, for example, *Headwaters Forest Def. v. Cty. of Humboldt*, 240 F.3d 1185, 1192 (9th Cir. 2000), *vacated on other grounds*, 534 U.S. 801 (2001).

It is undisputed that, as noted above, Grinder broke Brown's right arm by striking him with a baton. PF 10; Coroner's Report at 8 (x-ray shows "a displaced fracture of the right forearm associated with minute opaque fragments"). It is also undisputed that at some point during the struggle, Grinder injured his shoulder and broke a small finger and Taiariol suffered a scratch on his arm and a stiff back but did not suffer bruising.[6] *See* PF 6; DF 56; Taiariol Dep. 47:21-25, 88:16-22. Grinder ultimately shot Brown nine times. PF 16, Coroner's Report at 9. Brown died from the gunshot wounds. Coroner's Report at 17.

### 3. Disputed Facts

The remaining material facts are in dispute. Taiariol states that once Brown started running Taiariol repeatedly yelled for Brown to stop and surrender; however, a third-party witness, Sierra Looney, did not hear the commands, and video of the incident did not pick up these commands.[7] DF 17 (disputed); Nisenbaum Decl., Ex. D (Looney Dep.), ECF No. 71-4, at 58:5–19.

Taiariol testified he used his police baton on the back of Brown's shoulder in an attempt to knock him off balance during the chase, but was unsuccessful. DF 18 (disputed). Plaintiffs dispute that Taiariol used his baton at this point and in this way, pointing to the absence of any reference in the Coroner's report to contusions on the back of Brown's shoulders. *See* Coroner's Report at 9-10. Plaintiffs also cite the deposition testimony of Denise Velazquez, one of the witnesses to the incident, who testified she could not recall seeing either defendant strike Brown with a baton. Nisenbaum Decl., Ex. C, (Velazquez Dep.), ECF No. 71-3, at 15:25-16:3, 45:16-19.

---

[6] While defendants describe Taiariol's injuries as "soft tissue injuries," a characterization plaintiffs do not dispute, the court provides Taiariol's more precise description of his injuries here. *See* DF 56 (citing Taiariol Dep. 88:16-22) (identifying injuries).

[7] The video has been lodged with the court and the court has reviewed it.

According to Taiariol, the fence Brown was trying to scale collapsed as he grabbed Brown, and both Taiariol and Brown landed on top of the downed fence.  DF 22 (disputed).  Plaintiffs cite deposition testimony of Velazquez and Looney, both of whom testified that the fence stayed up during the altercation.  Velazquez Dep. at 52:1-8; Looney Dep. at 41:9-15.[8]  Both Velazquez and Looney also testified they saw officers trying to pull Brown off the fence but that there was no struggle on the ground between the officers and Brown.  Velazquez Dep. at 47:14–18; Looney Dep. at 44:12-22, 45:11-15. Taiariol says he told Brown to surrender and give him his hands.  DF 24 (disputed).  Plaintiffs respond that video of the incident picks up audio of Taiariol stating, "I told you to put your fucking hands behind your back, do you understand me?"  Resp. to DF 24 (citing Video at 2:15).  Taiariol claims Brown managed "to do a push-up type maneuver" off the ground while Taiariol was on Brown's back.  DF 26 (disputed).

According to Grinder, Brown was kicking his feet and attempting to strike Taiariol, and Brown did strike Taiariol several times in the chest, head, shoulder area and feet.  DF 33, 34 (disputed).  Grinder testified he attempted to gain control of Brown by physically putting Brown's hands behind his back, but Brown "continued actively fighting, resisting, and being non-compliant" with the officers' orders.  DF 35-36.  Plaintiffs dispute this evidence, citing Velazquez's and Looney's testimony that Brown never punched, hit or kick the officers.  Velazquez Dep. at 38:8-39:24, 60:19-61:20; Looney Dep. at 45:3-15.

Grinder testified that Brown got off the ground, began actively fighting both officers, and assumed a fighting stance.  DF 39 (disputed).  Plaintiffs dispute this, citing Taiariol's testimony he was not aware of Brown ever punching him or taking a fighting stance toward him or Grinder, and again citing to the testimony of Velazquez and Looney.  Taiariol Dep. 68:20-69:10; Velazquez Dep. at 61:21-24; Looney Dep. at 67:1-10.

---

[8] Defendants contend this testimony "is flatly contradicted by the video and the expert report of Alexander Jason (and attached photographs)."  Reply to DF 22; Objs., ECF No. 78-3 at 4 (arguing Figure 15 of the Jason Report shows the fence "was clearly downed").  After reviewing the video, Jason's declaration and photos accompanying Jason's Report, the court is unable to determine the location of the fence or whether it was downed. *See* Jason Decl., ECF No. 78-4; Jason Decl. Ex. F-2, ECF No. 78-4 at 22-34 (Jason Report).

Grinder and Taiariol both testified they were unable to gain control of Brown or effect his arrest. DF 41. According to Grinder, Brown took possession of Taiariol's baton and hit Taiariol with it while Taiariol was on his knees at Brown's feet. DF 45-46 (disputed). Taiariol testified he never felt a baton blow. Taiariol Dep. at 49:17-25. Grinder testified Brown then adopted a fighting stance, this time with the baton in his hand. DF 48 (disputed).

Taiariol testified he heard Grinder say, "Drop it. Drop it." DF 49 (disputed). According to Grinder, Brown then raised "the baton above his head with his right hand" and was readying to strike Taiariol a second time. DF 50 (disputed); Grinder Dep. at 142:7-25. Taiariol testified he was still on his knees and saw Brown standing with "his right arm [] up . . . and . . . an object maybe around six to eight inches long" above his arm; Taiariol began to move away from Brown and at some point unholstered his firearm. DF 51, 53 (disputed); Taiariol Dep. 86:20-87:19. Grinder says he feared Brown was about to strike Taiariol in the head with the baton,[9] which could be lethal, and he then shot Brown to death. DF 54-55 (disputed); Grinder Dep. at 130:21-25.[10]

---

[9] In their statement of undisputed facts, defendants do not acknowledge both officers' testimony that Brown used his right hand to hold the baton, according to Grinder, or the "object," according to Taiariol, after Grinder had earlier broken Brown's right arm with a baton strike. *See* DF 50, 51; PF 10. Plaintiffs flatly dispute that Brown was ever in possession of the baton but do not specifically address this issue; elsewhere they question the officers' claims that Brown "was able to raise up causing Defendant Taiariol to slip off of him" with a broken arm. *See* Opp'n at 18. Because Brown's right arm was indisputably broken and the officers' testimony, which both parties cite, raises a critical credibility issue, the court includes and considers that testimony here.

[10] The record on decedents' bullet wounds does not eliminate disputes regarding his position at the time Grinder shot him. Plaintiffs argue, "Velazquez testified that Brown's back was to the officers when he was shot. The Coroner's report indicates that at least one of the bullets entered Brown from the back to the front and a few bullets entered him from the side. The bullet that entered Brown from behind may well have spun him around allowing for the sideways and straight on paths of the other bullets." Opp'n at 17-18; *see* Coroner's Report at 10-11, 13 (noting a right forearm gunshot wound "traveled from back to front and downward in the forearm" and two chest gunshot wounds "traveled right to left," but not addressing whether any gunshot could have "spun [Brown] around"). Plaintiffs do not identify the portion of Velazquez's testimony they rely on. In excerpts provided to the court, Velazquez testified that Brown "fell down on his back" and was shot "after he tried getting back up." Velazquez Dep. at 39:21-40-7. Plaintiffs may have intended to refer to Looney's testimony. Although she could not recall

9

Plaintiffs dispute that Brown ever took possession of Taiariol's baton, or that he ever behaved aggressively toward either officer. Plaintiffs note Taiariol testified that when Brown got off the ground after Taiariol struggled to restrain him, Brown turned away from the officers rather than turning to face them. Taiariol Dep. at 82:18-83:24. Taiariol also testified he never felt a baton blow and did not suffer any bruising from the altercation. Taiariol Dep. at 47:17-25, 49:17-25. Both eyewitnesses, Looney and Velazquez, testified Brown never had any object in his hands during the entire struggle, and that Brown was "just trying to get over the fence mainly." Velazquez Dep. at 60:19-62:5; Looney Dep. at 65:14-67:13. In addition, Looney and Velazquez both testified that the struggle between Taiariol and Brown consisted of the two "trying to grab each other" while Brown was trying to scale the fence and Taiariol was trying to keep Brown from going over the fence. Velazquez Dep. at 39:4-24; Looney Dep. at 44:12-22. Both Velazquez and Looney testified there was no struggle beyond the attempt to keep Brown from scaling the fence. Velazquez Dep. at 38:1-39:18; Looney Dep. at 45:11-15. Velazquez testified that one of the officers "flung [Brown] over," that Brown "fell down on his back," and "after [Brown] tried getting back up, the cop just shot him." Velazquez Dep. at 39:21-24. Looney testified that the officers had "tried to pull [Brown] off the fence, and he was just wiggling. He wasn't moving his arms. He was just kind of trying to shimmy away and like trying to release them. And he did, he got away. Then he tried to go towards the fence again, and that's when he was shot." Looney Dep. at 44:17-22.

Defendants contend the "physical struggle lasted less than two minutes." DF 57 (disputed). Plaintiffs dispute this, citing Velazquez's estimate that the incident lasted four or five minutes, and Looney's that it lasted less than five minutes. Velazquez Dep. at 52:16–23; Looney Dep. at 51:4–8.

/////

---

whether Brown was standing when he was shot, Looney testified that Brown was shot as he attempted to jump the fence with his back to the officers. Looney Dep. at 40:9-41:8. Defendants dispute both Velazquez's and Looney's testimony, relying on their expert's opinion that the bullet trajectories are consistent with Brown's standing with his arm over his head when he was shot. Reply at 7; DF 51; Jason Decl. ¶ 10; Objs. at 4-5, 8.

1      B.      Procedural Background

2             To review, Brown's wife and successor-in-interest, his mother and children have

3      filed suit under 42 U.S.C. § 1983, alleging violations of Brown's federal constitutional rights and

4      making several state law claims. FAC ¶¶ 31–49. Specifically, plaintiffs allege excessive force in

5      violation of the Fourth Amendment, impairment of plaintiffs' rights to familial relationship in

6      violation of the Fourteenth Amendment, wrongful death—negligence, violation of the Bane Act

7      (California Civil Code section 52.1), intentional infliction of emotional distress (IIED), and

8      assault and battery. *Id.* Defendants move for summary judgment on all claims, as well as

9      plaintiffs' request for punitive damages. Mot. Plaintiffs have opposed but clarified that

10     decedent's mother Queen E. Brown proceeds only on the Fourteenth Amendment familial

11     association claim. Opp'n. Defendants have replied. Reply Mot. Summ. J., ECF No. 78.[11]

12     II.    LEGAL STANDARD FOR SUMMARY JUDGMENT

13            A court will grant summary judgment "if . . . there is no genuine dispute as to any

14     material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

15     The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

16     resolved only by a finder of fact because they may reasonably be resolved in favor of either

17     party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

18            As a general matter, the moving party bears the initial burden of showing the

19     district court "that there is an absence of evidence to support the nonmoving party's case."

20     *Celotex Corp.*, 477 U.S. at 325. The burden then shifts to the nonmoving party, which "must

21     establish that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith*

22     *Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to

23     particular parts of materials in the record . . . ; or show [] that the materials cited do not establish

24     the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

25     evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586

26

27            [11] All citations to the parties' briefs refer to the ECF page numbers, not the briefs' internal
       pagination. In addition, although defendants capitalize in full the parties' last names, the court
28     does not use that convention when quoting defendants' brief here.

("[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts"). Moreover, "the requirement is that there be no *genuine* issue of *material* fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Where a genuine dispute exists, the court draws inferences in plaintiffs' favor. *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). Parties may object to evidence cited to establish undisputed facts. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385-86 (9th Cir. 2010). A court may consider evidence that would be "admissible at trial." *Fraser*, 342 F.3d at 1036. But the evidentiary standard for admission at the summary judgment stage is lenient: A court may evaluate evidence in an inadmissible form if the evidentiary objections could be cured at trial. *See Burch*, 433 F. Supp. 2d at 1119-20. In other words, admissibility at trial depends not on the evidence's form, but on its content. *Block*, 253 F.3d at 418–19 (citing *Celotex Corp.*, 477 U.S. at 324). The party seeking admission of evidence "bears the burden of proof of admissibility." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002). If the opposing party objects to the proposed evidence, the party seeking admission must direct the district court to "authenticating documents, deposition testimony bearing on attribution, hearsay exceptions and exemptions, or other evidentiary principles under which the evidence in question could be deemed admissible . . . ." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 385–86. However, courts are sometimes "much more lenient" with the affidavits and documents of the party opposing summary judgment. *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

The Supreme Court has taken care to note that district courts should act "with caution in granting summary judgment," and have authority to "deny summary judgment in a case

12

where there is reason to believe the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255. A trial may be necessary "if the judge has doubt as to the wisdom of terminating the case before trial." *Gen. Signal Corp. v. MCI Telecomm. Corp.*, 66 F.3d 1500, 1507 (9th Cir. 1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)). This may be the case "even in the absence of a factual dispute." *Rheumatology Diagnostics Lab., Inc v. Aetna, Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d at 572); *accord Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001).

III.     ANALYSIS

    A.     Federal Claims

        1.     Unreasonable Seizure—Excessive Force (Fourth Amendment)

            a.     Both Defendants

Defendants seek summary judgment on plaintiffs' first claim for excessive force in violation of the Fourth Amendment. Mot. at 10–18. Defendants assert plaintiffs' claim fails as a matter of law and that they are entitled to qualified immunity. *Id.* The court first analyzes the merits of the claim and then addresses the second qualified immunity prong in a separate section below. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (it is "often beneficial" to begin with first part of test because it "promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable"); *Ioane v. Hodges*, 903 F.3d 929, 933 (9th Cir. 2018) (same) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014)).

The Fourth Amendment "guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "'Reasonableness is always the touchstone of Fourth Amendment analysis,' and reasonableness is generally assessed by carefully weighing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (internal citations omitted).

The guarantees of the Fourth Amendment include protection from the use of excessive force by "law enforcement officials . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen . . . ." *Graham*, 490 U.S. at 395. "All claims of excessive force, whether deadly or not, are analyzed under the objective reasonableness standard of the Fourth Amendment as enunciated in *Graham* and *Garner*." *Blanford v. Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005). This standard requires the court to "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). In striking this balance here, the court "must consider the risk of bodily harm that [defendants'] actions posed to [Brown] in light of the threat to the public that [defendants] w[ere] trying to eliminate." *Id.* The court pays "careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "Because this inquiry is inherently fact specific, the 'determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases.'" *Green v. City and Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (reviewing case based on investigatory stop) (quoting *Headwaters Forest Def.*, 240 F.3d at 1205–06).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Further, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. "Therefore, courts 'are free to consider issues outside the three enumerated [in *Graham* ] when additional facts are necessary to account for the

totality of circumstances in a given case.'" *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024 (9th Cir. 2015) (alteration in original) (quoting *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc)).

i.   Nature and Quality of Intrusion on Brown's Fourth Amendment Interests

It is undisputed that both Taiariol and Grinder struck Brown with their batons, and that Grinder broke Brown's right arm with a baton strike.[12]  It also is undisputed that Taiariol punched Brown in the face and struck him with his fists.  Taiariol admits to attempting to put Brown in a carotid hold, though he testified the attempt was unsuccessful.  Finally, it is undisputed Grinder shot Brown several times, causing his death.  There can be no reasonable disagreement that the nature and the quality of defendants' intrusion on Brown's Fourth Amendment interests were severe: Brown was beaten and then killed by defendants.  Precedent supports this conclusion, with respect to each type of force used by the officers here.[13]

a)   Baton Blows

"A police officer's use of baton blows [] presents a significant use of force capable of causing pain and bodily injury," a form of intermediate force.  *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1162 (9th Cir. 2011) (citing *United States v. Mohr*, 318 F.3d 613, 623 (4th Cir.

---

[12] Although plaintiffs dispute that Taiariol struck Brown in the back of his shoulders with his baton during the initial chase, Taiariol admits he struck Brown with his baton during the incident.  DF 27-29.

[13] Defendants argue they "used escalating levels of force as Brown's conduct quickly spiraled from violently resistive to violently assaultive," briefly describing Brown's alleged conduct and the officers' alleged uses of force.  *See* Mot. at 12.  Plaintiffs separately address and classify each use of force.  Opp'n at 15-16.  The court follows suit and addresses each use of force separately here, but notes "these separate analyses are contained within the overall *Graham* balancing of the totality of the circumstances, which considers, for example, the cumulative effects of [different uses of force]."  *See De Contreras v. City of Rialto*, 894 F. Supp. 2d 1238, 1252 n.12 (C.D. Cal. 2012); *see also Lawson v. City of Seattle*, No. C12-1994-MAT, 2014 WL 1593350, at *10 (W.D. Wash. Apr. 21, 2014) (declining defendant's proposed "parsing of plaintiffs' excessive force claim" by use of force because "[t]he jury should be allowed the opportunity to consider all of the force brought to bear against plaintiffs so that the necessary balance is appropriately weighed").

2003)).  The Ninth Circuit has observed California law enforcement officers are taught that batons should be used "only as a response to aggressive or combative acts," and at least one county sheriff's department has instructed officers that head strikes with an impact weapon are justified only when deadly force is justified.  *Id.*

b)  Fist Strikes

Fist strikes, or punches, also qualify as a significant use of force.  *See Davis v. City of Las Vegas,* 478 F.3d 1048, 1055 (9th Cir. 2007) (officer's use of force against arrestee who refused consent to search, including "slamming [arrestee] head-first against a wall, . . . sw[i]ng[ing] him into another wall, also head-first, thereby breaking his neck, . . . . plac[ing] his knee on his back . . . and punch[ing] him in the face" constituted "extremely severe" use of force); *Aranda v. City of McMinnville,* 942 F. Supp. 2d 1096, 1105 (D. Or. 2013) ("use [of] closed fist and knee to deliver multiple 'focused blows' to [an arrestee's] head, shoulder, and side" was "significant" use of force).  Closed fist punches, while generally less dangerous than baton strikes, are still capable of inflicting serious bodily injury.  *See Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007) (rational jury could find officer's punches "were not reasonably justified" because no "need for any use of force" under plaintiff's version of events); *Lopez v. City of Imperial*, No. 13-CV-00597-BAS WVG, 2015 WL 4077635, at *7 (S.D. Cal. July 2, 2015) ("Fist and knee strikes may also be considered a significant use of force.").  Head or face strikes are "a sufficiently serious intrusion upon liberty that it must be justified by a commensurately serious state interest."  *Young*, 655 F.3d at 1162-63.

c)  Carotid Hold

A carotid hold can constitute significant or even deadly force.  As noted above,

> [i]n the 'carotid' hold, an officer positioned behind a subject places one arm around the subject's neck and holds the wrist of that arm with his other hand.  The officer, by using his lower forearm and bicep muscle, applies pressure concentrating on the carotid arteries located on the sides of the subject's neck. The 'carotid' hold is

*/////*

capable of rendering the subject unconscious by diminishing the
flow of oxygenated blood to the brain.

*City of Los Angeles v. Lyons*, 461 U.S. 95, 97 n.1 (1983); *cf.* Taiariol Dep. at 78:4-16.

Some courts have found use of a carotid hold may constitute deadly force. *See Ayala v. City of S. San Francisco*, No. C06-02061 WHA, 2007 WL 2070236, at *7 (N.D. Cal. July 13, 2007) (reasonable jury could conclude carotid hold constituted deadly force); *see also Nava v. City of Dublin*, 121 F.3d 453, 458 (9th Cir. 1997) (declining to decide whether district court properly determined carotid hold constitutes deadly force), *overruled on other grounds in Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999). Other courts have found "the use of the carotid hold may constitute a significant use of force and threatens serious injury when applied multiple times." *Rascon v. Brookins*, No. CV-14-00749-PHX-JJT, 2018 WL 783675, at *10 (D. Ariz. Feb. 8, 2018); *see also Ericson v. City of Phoenix*, No. CV-14-01942-PHX-JAT, 2016 WL 6522805, at *13 (D. Ariz. Nov. 3, 2016) ("[I]n evaluating the type and amount of force inflicted, the Court observes that a carotid restraint or hold can result in great bodily injury if the hold is in place long enough."). Some law enforcement policies permit using a carotid hold only when lesser force is not available. *See Ayala*, 2007 WL 2070236, at *5 (under police department general order, "carotid restraints are to be employed only in those situations that require the immobilization of a combative and dangerous subject" and "only . . . by those officers who have been properly trained to do so").

d) <u>Firing of Gun</u>

Finally, Grinder's act of firing his gun at Brown multiple times, resulting in Brown's death, "constituted deadly force." *Blanford*, 406 F.3d at 1115 n.9 (citing *Smith v. City of Hemet*, 394 F.3d 689, 704–07 (9th Cir. 2005) (en banc)).

All of the above undisputed severe intrusions on Brown's Fourth Amendment interests need to be balanced against the government interests justifying the intrusion.

/////

/////

ii.     Governmental Interests

The court analyzes the governmental interests at stake in this case with reference to the *Graham* factors.

a)     Severity of Crime

The parties vigorously dispute the severity of Brown's crimes.  Defendants argue Brown's crimes were "significant" because "he assaulted Taiariol; was armed with a deadly weapon when he took possession of Taiariol's baton; and was in progress of either significantly injuring or killing Taiariol."  Mot. at 14.  Plaintiffs argue Brown's crimes were a "minor traffic violation, punishable by a citation" and "flight from the officers" while unarmed.  Opp'n at 16-17.

Disputes of material fact preclude a finding at summary judgment that Brown assaulted Taiariol, was armed with a deadly weapon, or was going to either significantly injure or kill Taiariol, as defendants argue.  Plaintiffs have met their burden of pointing to evidence they may seek to introduce showing that Brown was unarmed, never gained possession of Taiariol's baton or any other weapon, and never behaved aggressively toward either defendant.

Construing all evidence and drawing all reasonable inferences in plaintiffs' favor, as the court must, a reasonable jury could conclude the crime motivating the government's interest here was Brown's act of running away from the officers after the initial traffic stop and resisting their efforts to stop and restrain him, all while unarmed.  There are significant disputes of material fact as to whether Brown's resistance constituted more than trying to scale a fence and get away.  These disputes preclude the court's finding that plaintiff's criminal conduct justified the force used by defendants.

b)     Threat to Safety

"The second factor—whether the suspect posed an immediate threat—is the most important."  *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016), *cert. denied sub nom. Soeth v. Newmaker*, 137 S. Ct. 2217 (2017) (citing *Mattos*, 661 F.3d at 441).  Here, the same factual disputes preclude finding as a matter of law that Brown posed a sufficiently strong threat to public safety or the officers' safety so as to create a governmental interest that justified the

18

officers' actions. While defendants contend Brown gained control of Taiariol's baton, struck

Taiariol with the baton and "as soon as Brown readied the baton above his head he was a lethal

threat to Taiariol," Mot. at 13-14, as discussed above, plaintiffs vigorously dispute this narrative

and have presented evidence in support of their position.

Plaintiffs' evidence, if believed, shows only that Brown threw elbows while he

was face down on the ground and squirming. *See* PF 17. It is for the trier of fact, not this court,

to determine the level of resistance posed by Brown's movements and the level of resistance the

defendant officers reasonably perceived through those movements. At this juncture, the record

suggests a reasonable jury could find Brown's moving his elbows was a reaction to the officers'

blows. *See, e.g.*, *Flores v. Lackage*, 938 F. Supp. 2d 759, 774 (N.D. Ill. 2013) (denying summary

judgment where "[plaintiff] claims that he was only covering his face to protect himself and not

throwing elbows or flailing his arms. . . . His account portrays him as, at most, a passive

resister"); *Sheehan v. Bay Area Rapid Transit*, No. 14-CV-03156-LB, 2016 WL 777784, at *6

(N.D. Cal. Feb. 29, 2016) ("The evidence before the court leaves a genuine dispute over whether

[plaintiff] was punching or trying to punch [the] [o]fficer [] or if [the] [o]fficer [] reasonably

perceived that she was trying to punch him.").

Further, if believed, plaintiffs' evidence shows Brown posed little or no threat to

the officers after Grinder broke Brown's right arm. A reasonable jury could credit the undisputed

fact that Grinder broke Brown's right arm and decline to credit officer testimony that Brown later

used that same broken right arm to hit Taiariol with a baton and then threaten with the same arm a

potentially lethal second baton blow. *See* PF 10; DF 45-48, 50-51 (disputed); Grinder Dep. at

141:19-142:25. A jury could reasonably conclude Brown did not pose a threat to officer safety

that justified the officers' use of force.

Defendants do not argue Brown posed a risk to public safety. *See* Mot. at 13-14.

And no evidence of record suggests any member of the public was affected by Brown's actions,

directly or indirectly. In the deposition excerpts before the court, neither Velazquez nor Looney,

both of whom testify they witnessed the incident, were asked whether they felt they were in

danger at any point the incident. *See generally* Velazquez Dep. & Looney Dep.; *cf.* Looney Dep.

32:23-33:4 (saying only that several young children ran to watch police chase and she "didn't want them to see anything that would be too traumatic").  Both witnesses stayed on the scene until they were ordered to leave, which supports an inference they did not fear for their safety. *See* Velazquez Dep. at 41:23-25 (testifying she left scene when one officer "pointed the gun at us and told us to go in the house" after Brown was shot); Looney Dep. at 50:2-21 (same).

The disputes of material fact as to officer safety preclude the court's finding plaintiff posed a threat to anyone's safety sufficient to justify the force used by defendants.

c) <u>Active Resistance</u>

Resistance is not "a binary state, with resistance being either completely passive or active.  Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010).  "While 'purely passive resistance can support the use of some force, [] the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance.'" *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir. 2013) (quoting *Bryan*, 630 F.3d at 830) (alteration in original).  Although it is not disputed that Brown fled from officers, as discussed above the parties dispute the level of Brown's resistance to the officers.  These factual disputes, all of which require a trier of fact to make credibility determinations, also preclude a dispositive finding at summary judgment about Brown's level of "active resistance."

Viewing the evidence in the light most favorable to plaintiffs, as required here, Brown's resistance was limited to fleeing from the traffic stop after officers had determined he was unarmed and obtained his identifying information; then, when the officers pursued him and he was face down on the ground, Brown threw his elbows.  A rational jury could conclude this factor weighs in favor of plaintiffs and does not support the officers' use of force.

iii. <u>Other Factors</u>

As noted, "the *Graham* factors are not exclusive."  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1033–34 (9th Cir. 2018).  Courts may consider other factors, including, as relevant here, "the availability of less intrusive force" and "whether proper warnings were given."

20

1   *Id.* (citing *Bryan*, 630 F.3d at 831; *Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir.

2   2001)).  Here, a genuine dispute of material fact remains as to whether the defendants issued any

3   commands for Brown to stop running during the pursuit before Taiariol struck Brown with the

4   baton, Grinder broke Brown's arm with his baton strikes, Taiariol punched Brown in the face

5   several times and Grinder shot Brown.  *See Deorle*, 272 F.3d at 1283–84 ("The absence of a

6   warning or an order to halt is also a factor that influences [sic] our decision. . . . [S]uch warnings

7   should be given, when feasible, if the use of force may result in serious injury, and [] the giving

8   of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing

9   test.").[14]

10                          b.       Defendant Taiariol: Integral Participation

11                  Defendants also distinguish Taiariol's uses of force from Grinder's uses of force,

12  contending in multiple places "[i]t is undisputed that Grinder shot Brown" and that "at no time

13  did Taiariol fire his weapon." Mot. at 11; *see also id.* at 20 (asserting plaintiffs' state law claim

14  for wrongful death—negligence should not apply to Taiariol because Brown died from Grinder's

15  shooting Brown); Reply at 10 (arguing Taiariol did not cause Brown's death).  In opposition,

16  plaintiffs do not dispute that Grinder shot and killed Brown. Opp'n at 15 (stating Grinder shot

17  Brown "no less than nine times"); *id.* at 21 (stating Brown "committed a minor traffic violation,

18  was unarmed, and attempting to flee capture by scaling a fence when the [d]efendant Grinder shot

19  him"); *see also* FAC ¶ 19 (alleging Grinder shot Brown "11 times").  However, at hearing,

20  plaintiffs argued Taiariol could still be liable for excessive force under the integral participation

21  doctrine.

22                  An officer may be liable for the conduct of others where he or she was an "integral

23  participant" in the alleged constitutional violation.  *Blankenhorn*, 485 F.3d at 481 n.12.

24

25         [14] The Supreme Court has cautioned that *Deorle* should not be read "too broadly in
    deciding whether a new set of facts is governed by clearly established law."  *Kisela v. Hughes*,
26  138 S. Ct. 1148, 1154 (2018) (citing *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765,
    1775-77 (2015)).  The court cites *Deorle* here only for the proposition that the presence or
27  absence of a warning to halt may be considered in determining whether a particular use of force
    was excessive.
28

"[I]ntegral participation does not require that each officer's actions themselves rise to the level of a constitutional violation." *Id.* (quoting *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004)). "But it does require some fundamental involvement in the conduct that allegedly caused the violation." *Id.* The Ninth Circuit has declined to find an officer was an integral participant when he was not present at the scene of the arrest, had not instructed anyone to arrest the suspect, and did not consult with others before they made the arrest. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1206 (9th Cir. 2008). It also has declined to find an officer an integral participant when the evidence showed he was interviewing witnesses outside a suspect's house as others conducted an unconstitutional search of the house, without any evidence the officer participated in planning the search. *Hopkins v. Bonvicino*, 573 F.3d 752, 769–70 (9th Cir. 2009). But an officer who provides armed backup or participates in an unconstitutional police action with knowledge that action will be taken but without objecting may be liable under the integral participation doctrine. *Boyd*, 374 F.3d at 780 (citing *James ex rel. James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990), and *Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989)).

Here, the court cannot conclude as a matter of law that Taiariol was not an integral participant in the shooting death of Brown. Construing all evidence and drawing all reasonable inferences in favor of plaintiffs, the court observes that in response to Brown's running away, Taiariol pulled Brown off a fence, struck Brown with a baton, punched Brown in the face several times, attempted to place Brown in a carotid hold and drew his own firearm before Grinder shot Brown to death. DF 21, 27, 29, 38, 53, 54; Taiariol Dep. at 57:9–58:9, 72:4–19. A reasonable jury could find Taiariol did not "simply remain[] outside" or away from Grinder while Grinder shot Brown. *See Jones v. Williams*, 297 F.3d 930, 939 (9th Cir. 2002). Instead, a reasonable jury could find Taiariol provided "armed backup" to Grinder and participated meaningfully in the alleged constitutional violations. *See Boyd*, 374 F.3d at 780 (citing *James*, 909 F.2d at 834).

This case is like others in which courts have found sufficient evidence of integral participation to permit a claim to go to the jury. For instance, in *Estate of Crawley*, the court found with defendant's "participation in the decision-making and the breach" of a residence, his conduct "could result in a jury finding that he was an integral participant in a constitutional

deprivation" involving use of deadly force. *Estate of Crawley v. McRae*, No. 1:13-CV-02042-LJO, 2015 WL 5432787, at \*34 (E.D. Cal. Sept. 15, 2015). Also, in *Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1161 (E.D. Cal. 2016), "a reasonable jury could infer from the circumstances that [two officers] were integral participants" in allegedly unconstitutional use of force because the officers had arrived on the scene as backup and had assisted in handcuffing, restraining and hog-tying plaintiff before "officers used impact blows and prolonged body-weight pressure to [arrestee's] back."

The court cannot conclude as a matter of law that Taiariol was not an integral participant in Grinder's shooting of Brown.

### c.  Summary

For the foregoing reasons, multiple genuine disputes of material fact including over the extent of Brown's resistance, the threat he may have posed and what orders, if any, defendants issued preclude this court's ruling as a matter of law in defendants' favor on plaintiffs' excessive force claim. *See Newmaker*, 842 F.3d at 1116 ("Summary judgment is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt.").

### 2.  Substantive Due Process (Familial Association)

Defendants contend the evidence of record cannot support a jury's finding for plaintiffs on their Fourteenth Amendment substantive due process claim of deprivation of familial association. Mot. at 18-20. Plaintiffs contend that "material fact questions preclude summary judgment on this basis as percipient witnesses testified that Mr. Brown never attacked the Defendant Officers and never had an object in his hand." Opp'n at 22. Further, plaintiffs state that defendants "had no legitimate interest in chasing Mr. Brown" or "using deadly impact blows to his head, baton blows to his limbs breaking his bones, and they certainly had no legitimate interest in shooting him to death just to effect their traffic stop of him." *Id.* at 22-23.

A parent has a "fundamental liberty interest" in "the companionship and society of his or her child" and "[t]he state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. §] 1983." *Kelson v. City of Springfield*, 767 F.2d 651, 655 (9th Cir. 1985). In the Ninth Circuit, a parent may assert this right arising from the loss of

companionship and society of his or her adult child.  *See Porter v. Osborn*, 546 F.3d 1131, 1132, 1136 (9th Cir. 2008) (citing *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991); *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998)).

      To establish a constitutional substantive due process violation as alleged here, plaintiffs must show the officers' conduct "shocks the conscience."  *Porter*, 546 F.3d at 1137 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  In determining whether excessive force shocks the conscience, the first inquiry is "whether the circumstances are such that actual deliberation [by the officer] is practical."  *Id.* (citing *Moreland*, 159 F.3d at 372) (internal quotation marks omitted)).

      "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience."  *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).  "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives."  *Id.*  Under the purpose to harm standard, the court looks at the totality of the circumstances to assess whether a jury could reasonably infer any of the officers were acting for purposes other than legitimate law enforcement.  *Porter*, 546 F.3d at 1141.

      Here, even assuming actual deliberation was not practical and applying the purpose to harm standard, the court finds that under the totality of the circumstances a jury could reasonably find either or both of the officers were acting with a purpose other than legitimate law enforcement.  Drawing all reasonable inferences in plaintiffs' favor, Brown fled from police on foot after officers had identified him and confirmed he was unarmed, attempted to climb over a fence and moved his elbows while squirming face down on the ground.  In light of these facts, a reasonable jury could find Brown did not pose a serious or fatal threat to the officers and also could find defendants' decisions to strike Brown repeatedly with batons and one officer's ultimately shooting him to death evinced a "purpose to harm unrelated to legitimate law enforcement objectives."  *Wilkinson*, 610 F.3d at 554.

On this record, the court cannot determine defendants are entitled to judgment as a matter of law on the substantive due process claim.

### 3. Qualified Immunity

Defendants contend they are entitled to qualified immunity on plaintiffs' Fourth Amendment excessive force claim and Fourteenth Amendment substantive due process claim because "there is no clearly established right that Taiariol need to subject himself to Brown's use of injurious or deadly force before Grinder is able to intervene and defend him."[15] Mot. at 16-18. Plaintiffs contend "Brown committed a minor traffic violation, was unarmed, and attempting to flee capture by scaling a fence when Defendant Grinder shot him," and, under those circumstances, it was clearly established that the officers' uses of force were unconstitutional. Opp'n at 21.

### a. Background and Two-Pronged Test

"Qualified immunity is a judge-made doctrine[16] designed to 'balance[ ] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011) (quoting *Pearson*, 555 U.S. at 231). The doctrine is intended to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

The two-pronged test currently used for assessing whether qualified immunity applies was first articulated in *Saucier v. Katz*, 533 U.S. 194 (2001). *Pearson*, 555 U.S. at 232

---

[15] While defendants' briefing addresses qualified immunity principles generally, defendants provide virtually no briefing as to qualified immunity on the specific claims at issue here. *See* Mot. at 16-18; Reply at 13. Plaintiffs likewise provide minimal briefing. *See* Opp'n at 19-21. Because defendants indicate in passing that they are entitled to qualified immunity on both "Plaintiffs' first and second causes of action," the court assumes defendants have invoked qualified immunity in the face of plaintiff's Fourth Amendment and Fourteenth Amendment claims. *See* Mot. at 18.

[16] In light of the judicial origins of the doctrine, the Supreme Court has observed "[a]ny change should come from this Court, not Congress." *Pearson*, 555 U.S. at 234.

25

(citing *Saucier*, 533 U.S. at 201).  Under that test, the court first "decide[d] whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right."  *Id.* (citing *Saucier*, 533 U.S. at 201 and Fed. R. Civ. P. 12, 50, 56).  Then, "if the plaintiff [] satisfied this first step, the court [] decide[d] whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Id.* (citing *Saucier*, 533 U.S. at 201).

Since *Pearson,* courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 236.  Here, the court has exercised its discretion and analyzed the first merits prong above.

"[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *Tolan*, 572 U.S. at 656 (citations omitted) (per curiam).[17] "This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Id.* (quoting *Anderson*, 477 U.S. at 249); *see also Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) ("'[T]he ordinary framework for deciding motions for summary judgment' applies to motions for summary judgment based on official immunity.") (citation omitted).  In particular, in determining the established law, the court must take care not to define either the right at issue, or the defendant's conduct for that matter, in a manner that impermissibly resolves factual disputes. *Tolan*, 572 U.S. at 657 ("[C]ourts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions.") (citing *Brosseau v. Haugen*, 543 U.S. 194, 195 (2004)).

/////

/////

/////

---

[17] In *Tolan*, the Fifth Circuit erred by failing "to view the evidence at summary judgment in the light most favorable to Tolan with respect to the central facts of this case."  572 U.S. at 658.

On the second qualified immunity prong, the Ninth Circuit has indicated it is the plaintiff's burden to identify the clearly established law[18] to which a defendant was held at the relevant time. *Moran v. State of Wash.*, 147 F.3d 839, 844 (9th Cir. 1998) ("[T]he plaintiff bears the burden of proving that the rights she claims were 'clearly established' at the time of the alleged violation.") (citing *Davis v. Scherer*, 468 U.S. 183, 197 (1984)); *Olivier v. Baca*, No. 13-56371, 2019 WL 166117, at *6 (9th Cir. Jan. 11, 2019) ("The burden is on the party contesting qualified immunity to show that a law was clearly established at the time of an alleged violation.") (also citing *Davis*, 468 U.S. at 197–98). "To meet their burden, plaintiffs must generally identify a case where an officer acting under similar circumstances was held to have violated the [constitutional provision underlying a claim]." *Felarca v. Birgeneau*, 891 F.3d 809, 822 (9th Cir. 2018) (re Fourth Amendment claim, citing *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002)); *see also Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1038–39 (9th Cir. 2018) (defendant entitled to qualified immunity where plaintiff "has not identified any sufficiently analogous cases" and "none of [plaintiff]'s cited cases demonstrate that the contours of his Fourth Amendment right were sufficiently clear" and "[plaintiff] points to no case that considered the relevant question"). At the same time, because resolving whether the asserted federal right was clearly established presents a pure question of law, the court is not aware of any reason it should not draw on its "full knowledge" of relevant precedent in laying a strong foundation at the trial court level, rather than restricting its review to cases identified by plaintiff. *See Elder v. Holloway*, 510 U.S. 510, 514-16 (1994) (holding appellate court must review qualified immunity judgment de novo and resolve whether federal right was clearly established in light of "its full knowledge of its own [and other relevant]

---

[18] The Ninth Circuit has recently observed: "Some argue that the 'clearly established' prong of the analysis lacks a solid legal foundation." *Rodriguez v. Swartz*, 899 F.3d 719, 732 n.40 (9th Cir. 2018) (citing William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45 (2018); *see also Ziglar v. Abbasi*, 137 S.Ct. 1843, 1872 (2017) (Thomas, J., concurring in part and concurring in the judgment) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence.")). Nonetheless, the Circuit went on to note it "must apply" the test given the current state of the law. *Id.*

precedents") (alteration in original) (citing *Davis*, 468 U.S. at 192 n.9 ("We see no reason to doubt . . . that the Court of Appeals . . . had full knowledge of its own precedents and correctly construed them.")).[19]

The court now turns to the second prong of qualified immunity below.

      b.     <u>Second Prong: Method of Determining Clearly Established Law</u>

The Supreme Court has assumed without deciding that the law as determined by a Circuit court may constitute clearly established law. *See, e.g.*, *Kisela*, 138 S. Ct. at 1153 ("[E]ven if a controlling circuit precedent could constitute clearly established law in these circumstances, it does not do so here.") (quoting *Sheehan*, 135 S. Ct. at 1776); *Elder*, 510 U.S. at 516; *City of Escondido v. Emmons*, __ U.S. __, 2019 WL 113027, *3 (Jan. 7, 2019) (per curium); *see also Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1221 & n.13 (9th Cir. 2015) (noting that in *Hope v. Pelzer*, 536 U.S. 730, 741–45 (2002), the Court looked to "binding circuit precedent" to determine clearly established law and has not yet "overruled *Hope* or called its exclusive reliance on circuit precedent into question").

The Ninth Circuit makes clear it "first look[s] to binding precedent to determine whether a law was clearly established." *Ioane*, 903 F.3d at 937 (citing *Chappell v. Mandeville*,

---

[19] The *Felarca* panel found that because "plaintiffs [] identified no [] case" satisfying the second prong of the qualified immunity analysis, the defendants were entitled to qualified immunity. 891 F.3d at 822. Although not entirely clear, it appears the *Felarca* panel may have drawn on authority that ultimately traces its provenance to the Ninth Circuit's earlier misreading of *Davis*, 468 U.S. at 197–98, as captured in *Elder v. Holloway*, 975 F.2d 1388, 1392 (9th Cir. 1991), *rev'd*, 510 U.S. 510 (1994). *See Felarca*, 891 F.3d at 822 (citing *Sorrels*, 290 F.3d at 969, which in turn cites *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993), which cites *Elder*, 975 F.2d at 1390 and *Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991), both of which cite *Davis*, 468 U.S. at 197). In *Elder*, the Ninth Circuit held that "the plaintiff's burden in responding to a request for judgment based on qualified immunity is to identify the universe of statutory or decisional law from which the court can determine whether the right allegedly violated was clearly established." *Elder*, 975 F.2d at 1392-94. Rejecting this reading, the Supreme Court held that "*Davis* . . . concerned not the authorities a court may consider in determining qualified immunity, but this entirely discrete question: Is qualified immunity defeated where a defendant violates any clearly established duty, including one under state law, or must the clearly established right be the federal right on which the claim for relief is based?" *Elder*, 510 U.S. at 515. Clarifying that "[t]he [*Davis*] Court held the latter," the *Elder* Court went on to explain that an appellate court reviewing a qualified immunity decision is not limited to plaintiff's proffered cases, but is instead required to draw upon all relevant precedent. *Id.* at 516.

28

706 F.3d 1052, 1056 (9th Cir. 2013)); *see Carrillo*, 798 F.3d at 1221 ("clearly established law" includes "controlling authority in [the defendants'] jurisdiction" (alteration in original) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). If no binding precedent "is on point, [the Ninth Circuit] may consider other decisional law." *Chappell*, 706 F.3d at 1056. Ultimately, "the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (citing *Wilson*, 526 U.S. at 617).

Recent Supreme Court guidance, including from the most recent Court term, and Ninth Circuit precedent channels this court's determination of the established law. The precedent is reviewed below to clarify the general rules applicable and the purpose they embody, but also to note acknowledged exceptions.

i.   Level of Specificity

Clearly established law must be defined with a "high 'degree of specificity.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam)); *Emmons*, 2019 WL 113027, at *2-3. This standard is "demanding." *Wesby*, 138 S. Ct. at 589.

The "legal principle [at issue] must have a sufficiently clear foundation in then-existing precedent." *Id.* It "must be 'settled law,' . . . , which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority,'" rather than merely "suggested by then-existing precedent." *Id*. at 589-90 (citations, some internal quotation marks omitted).

While "a case directly on point" is not required "for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate," *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551), and must "'squarely govern[]' the specific facts at issue." *Id.* at 1153 (citing *Mullenix*, 136 S. Ct. at 309); *see also Pike v. Hester*, 891 F.3d 1131, 1141 (9th Cir. 2018) ("An exact factual match is not required . . . ."). "The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 138 S. Ct. at 590 (quoting *Saucier*, 533 U.S. at 202). Thus, "[t]he dispositive question is 'whether the violative

29

nature of *particular* conduct is clearly established.'" *Ziglar*, 137 S. Ct. at 1866 (quoting

*Mullenix*, 136 S. Ct. at 308) (emphasis, alteration in original).

"This requirement—that an official loses qualified immunity only for violating

clearly established law—protects officials accused of violating 'extremely abstract rights.'"

*Ziglar*, 137 S. Ct. at 1866 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).  In one oft-

quoted summation of these principles, the Court has said qualified immunity "protects 'all but the

plainly incompetent or those who knowingly violate the law." *Wesby*, 138 S. Ct. at 589 (quoting

*Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Consistent with this guidance, the Court repeatedly has cautioned lower courts,

"and the Ninth Circuit in particular—not to define clearly established law at a high level of

generality." *Kisela*, 138 S. Ct. at 1152 (quoting *Sheehan*, 135 S. Ct. at 1175-76).  The Circuit has

acknowledged as much, while also noting its understanding that "[it] need not identify a prior

identical action to conclude that the right is clearly established." *Ioane*, 903 F.3d at 937 (citing

*Anderson*, 483 U.S. at 640).

ii.     Notice/Fair Warning

Specificity is required to provide officials with notice of what conduct runs afoul

of the law.  "Because the focus is on whether the officer had fair notice that her conduct was

unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct."

*Kisela*, 138 S. Ct. at 1152 (quoting *Brosseau*, 543 U.S. at 198); *see also Tolan*, 572 U.S. at 656

("'[T]he salient question . . . is whether the state of the law' at the time of an incident provided

'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'") (quoting

*Hope*, 536 U.S. at 741) (alterations in original).

The Court has explained that "[p]recedent involving similar facts can help move a

case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby

provide an officer notice that a specific use of force is unlawful." *Kisela*, 138 S. Ct. at 1153

(quoting *Mullenix*, 136 S. Ct. at 312).  Although "'general statements of the law are not inherently

incapable of giving fair and clear warning to officers,' . . . . constitutional guidelines [that] seem

inapplicable or too remote" will not suffice. *Id.* (quoting *White*, 137 S. Ct. at 552).

30

Put another way, "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Id.* (quoting *Plumhoff*, 572 U.S. at 778-79). Accordingly, "a court must ask whether it would have been clear to a reasonable officer that the alleged conduct 'was unlawful in the situation he confronted.'" *Ziglar*, 137 S. Ct. at 1867 (quoting *Saucier*, 533 U.S. at 202).

### iii.    Novel Factual Circumstances and "Obvious Cases"

In certain cases, qualified immunity may not be available to a defendant even if a new set of circumstances is presented to the court through a civil rights claim. Determining on which side of the line a novel claim falls is a part of the court's task in wrestling with qualified immunity, given that guidance is sparse. The Supreme Court has observed "there can be the rare 'obvious case,' where the unlawfulness of the conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (citing *Brosseau*, 543 U.S. at 199); *see also Ziglar*, 137 S. Ct. at 1867 ("[A]n officer might lose qualified immunity even if there is no reported case 'directly on point.' But 'in the light of pre-existing law,' the unlawfulness of the officer's conduct 'must be apparent'" (quoting *Anderson*, 483 U.S. at 640)). As the Ninth Circuit articulates the proposition, in some circumstances "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Bonivert v. City of Clarkston*, 883 F.3d 865, 872 (9th Cir. 2018) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)); *see also Rodriguez*, 899 F.3d at 734 (a defendant can "lose[] qualified immunity, even in novel situations, if he or she commits a 'clear' constitutional violation.") (citing *Hope*, 536 U.S. at 738-39)); *Sharp*, 871 F.3d at 911 n.7 (observing "some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing. Indeed, it would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." (quoting *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082–83 (10th Cir. 2015)))).

31

As the Eleventh Circuit has explained, in the Fourth Amendment context at least, certain "conduct 'lies so obviously at the very core of what the [] Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2012) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002)); *see also J.W. v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1260 (11th Cir. 2018) ("Th[e] . . . 'obvious clarity' scenario, is a 'narrow exception' to the 'normal rule that only case law and specific factual scenarios can clearly establish a violation.'" (quoting *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011))).

In any event, higher courts' use of the words "novel," "obvious" and "clear" conveys the sense that no more complicated definitions are required. The contours of what qualifies as "novel circumstances" or an "obvious" case as may be relevant here can best be discerned from cases resolved on these grounds.

In *Rodriguez*, an "obvious" case, "[a] U.S. Border Patrol agent standing on American soil shot and killed a teenage Mexican citizen who was walking down a street in Mexico." *See* 899 F.3d at 726, 734. Because "[a]ny reasonable officer would have known, even without a judicial decision to tell him so, that it was unlawful to kill someone—anyone—for no reason," it was clearly established that "the Constitution banned federal officers from gratuitous cross-border killings," even without a case on all fours. *See id.* at 733. The court observed that in *Garner*, 471 U.S. at 3-4, 11, the Supreme Court had held "an officer could not shoot a non-threatening, fleeing suspect," and with that backdrop no reasonable officer could, for example, "treat it as an open question whether an officer could kill a non-threatening person who was not a suspect and who was not fleeing" or "since the police officer in *Garner* shot the fleeing suspect with a gun, [treat] it [as] an open question if an officer shot a fleeing suspect with a crossbow[.]" *Id.* (citations omitted).

In *Bonivert,* defendant officers entered the plaintiff's home without a warrant, where no exception to the warrant requirement applied. 883 F. 3d at 873. Responding to the defendants' argument that no precedent had resolved the precise facts underlying plaintiff's claim, the Ninth Circuit observed, "This is not a case involving 'such an undeveloped state of the

law' that qualified immunity is necessary to protect the officers from the special unfairness that results when they are 'expected to predict the future course of constitutional law.'" *Id.* (quoting *Wilson*, 526 U.S. at 617-18) (internal citation omitted). Rather, the officers were not entitled to qualified immunity given that the unlawful entry claim turned on "bedrock Fourth Amendment principles" and "basic, unquestioned rights," which rendered the officers' "mistake[] 'as to what the law require[d]' to justify a warrantless entry . . . not 'reasonable.'" *Id.* at 872-74 (citations omitted).

The case of *Juan Hernandez v. City of San Jose* also was an obvious and thus exceptional case. 897 F.3d 1125 (9th Cir. 2018). There, the Circuit affirmed the denial of a motion to dismiss where plaintiffs alleged "officers shepherded them into a violent crowd of protesters and actively prevented them from reaching safety . . . . even while witnessing the violence firsthand, and even though they knew the mob had attacked Trump supporters at the Convention Center earlier that evening, and that similar, violent encounters had occurred in other cities." *Id.* at 1138. The court concluded that, as alleged, the case "is 'one of those rare cases' in which the constitutional violation 'is so "obvious" that we must conclude . . . qualified immunity is inapplicable even without a case directly on point." *Id.* at 1138 (quoting *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013)).

In determining the clearly established law as relevant to this case, the court bears in mind the guidance reviewed above. As explained below the court finds the law clearly established so as to preclude the officers prevailing in their qualified immunity argument. Thus, the court does not consider whether this is a novel or obvious case.

          c.     <u>Clearly Established Fourth Amendment Law Applicable to Plaintiff's Claim</u>

In this case, the general Fourth Amendment standards discussed above provide a "starting point," but "[t]he dispositive question is 'whether the violative nature of [the officers'] *particular* conduct [was] clearly established" on April 6, 2012. *Isayeva v. Sacramento Sheriff's Department*, 872 F.3d 938, 947 (9th Cir. 2017) (quoting *Mullenix*, 136 S. Ct. at 308) (emphasis in original). The Court has cautioned that "[s]pecificity is especially important in the Fourth

Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Kisela*, 138 S. Ct. at 1152 (quoting *Mullenix*, 136 S. Ct. at 308). Thus, in excessive force claims, "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id.* at 1153 (quoting *Mullenix*, 136 S. Ct. at 309). Nonetheless, as noted generally above, "officials may 'still be on notice that their conduct violates established law even in novel factual circumstances,'" and courts should remain "particularly mindful of this principle in the Fourth Amendment context" to ensure the fact-intensive inquiry required by the Fourth Amendment does not shield officers from liability without "further[ing] the purpose of qualified immunity . . . ." *See Bonivert*, 883 F.3d at 872–73 (quoting *Mattos*, 661 F.3d at 442; *Pearson*, 555 U.S. at 23).

Defendants' qualified immunity argument focuses on, and erroneously treats as undisputed, Brown's alleged combativeness, possession of Taiariol's baton, striking of Taiariol with that baton, and "readying to deliver another strike [to Taiariol]; this time with significantly injurious or deadly consequence." Mot. at 17. Defendants thus contend "[t]he right to be analyzed is Brown's right to resist arrest, possess a deadly weapon, and use that deadly weapon in an effort to evade arrest." *Id.*; *see also id.* at 16 ("No public safety officer must subject themselves to imminent death before being able to defend themselves."). They argue "Taiariol and Grinder were allowed by law to overcome the force and resistance being used by Brown" and "[t]here is no clearly established rule . . . that officers cannot use deadly force if a suspect poses a threat of serious physical harm to the officer or others." *Id.* at 16, 18. Plaintiffs counter that "viewing the facts in the light most favorable to Plaintiffs, Brown was not locked in hand-to-hand combat with the Defendant Officers and at no point took their weapons from them, his struggle was to escape not to fight and win." Opp'n at 21. Plaintiffs thus contend the right they seek to vindicate is the right to be free from significant and deadly force when fleeing a traffic stop while unarmed and not dangerous. Opp'n at 21.

"[T]ak[ing] care not to define [this] case's 'context' in a manner that imports genuinely disputed factual propositions" and without "resolv[ing] genuine disputes of fact in

favor of the party seeking summary judgment," *Tolan*, 572 U.S. at 656-57 (citations omitted), the court may grant summary judgment "only if Defendants are entitled to qualified immunity on the facts as alleged by the non-moving party," *Blankenhorn*, 485 F.3d at 477 (citing *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991)).  Construing the record as required, the pertinent question is whether it was clearly established that officers' hitting Brown with their batons with enough force to break his arm, tackling and punching him, attempting to place him in a carotid hold and fatally shooting him was unreasonable in response to his running away after the initial traffic stop, attempting to scale a fence to escape and throwing elbows while squirming face down on the ground, all after officers had confirmed he was unarmed.

Defendants' arguments on their entitlement to qualified immunity for these uses of force are minimal and already reviewed above.  *See* pages 24-25 & n.15, 34 *supra*.  In opposition, plaintiffs cite *Garner*, 471 U.S. at 3-4, 11, and *Blankenhorn*, 485 F.3d at 481, asserting these cases "clearly established that deadly force under these circumstances was a constitutional violation" and "use of significant and deadly force by deploying impact blows was unconstitutional."  Opp'n at 21.

In *Garner*, a police officer shot and killed a suspected burglar as he "began to climb over [a] fence" after the officer had instructed him to halt.  471 U.S. at 3-4.  The officer was "reasonably sure" the suspect was unarmed but "[c]onvinced that if [the suspect] made it over the fence he would elude capture . . . ."  *Id.*  The Court held, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. . . .  A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."  *Id.* at 11.  But "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."  *Id.*

In *Blankenhorn*, the plaintiff, suspected of the "minimal" crime of misdemeanor trespass, admitted he was "angry," "loud" and "used profanity" in his interaction with police officers, and video captured him "gestur[ing] several times by raising his arms above his head and

touching his chest" and "approach[ing] [an officer] and once point[ing] at him." 485 F.3d at 469, 478. The Ninth Circuit found "a rational jury could conclude from [plaintiff's] cooperative behavior with [one officer present] just three weeks before his arrest, the fact that [two officers present] discovered him talking casually with a friend, and the video footage . . . that [plaintiff] did not pose a serious threat to the officers' or others' safety." *Id.* at 478. Although the plaintiff "verbally refused to comply with [an officer's] request to kneel down, a reasonable jury could conclude . . . [the officer] never tried to handcuff [plaintiff], and [plaintiff] did not actively resist being handcuffed," rendering defendants' "gang-tackl[ing] [plaintiff]" unreasonable. *Id.* at 478-79. Further, while video showed that plaintiff "struggled with [officers] for several seconds before being tackled to the ground," the officers' conduct "could reasonably be considered 'provocative,' triggering [plaintiff's] limited right to reasonable resistance and thus making their later use of hobble restraints unreasonable." *Id.* at 479-80. Finally, "a rational jury could find that if [plaintiff] did not maneuver his arms beneath his body it eliminated the need for any use of force to release them, and thus that [the officer's] punches were not reasonably justified by the circumstances as he claims." *Id.* at 480 (footnote omitted).

Here, on the facts as properly construed on summary judgment, it was clearly established and would have been apparent to any reasonable officer that it is unlawful to shoot a person whose identity and unarmed status had been confirmed as he attempted to flee a traffic stop and parole search of his car. *See Garner*, 471 U.S. at 11 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."); *A. K. H by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) ("Deadly force is permissible only 'if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm.'") (quoting *Garner*, 471 U.S. at 11); *see also Foster v. City of Indio*, 908 F.3d 1204 (9th Cir. 2018) (clearly established law applicable to Fourth Amendment excessive force claim that "'[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. . . . A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.'" (citation omitted)).

36

In reaching this conclusion, the court follows the Ninth Circuit's direction in *Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994). There, the Ninth Circuit held a court "may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id.* at 915. More recently, the Ninth Circuit, relying in part on *Scott*, has stated "[q]ualified immunity should not be granted when other evidence in the record . . . is inconsistent with material evidence proffered by the defendant." *Newmaker*, 842 F.3d at 1116 (citations omitted). In *Newmaker*, officer accounts that decedent was fatally shot while decedent "was standing and swinging [a] baton" were "materially contradicted by evidence in the record," permitting a reasonable jury to "conclude that [officers] were wrong when they claimed that [decedent] grabbed the baton." *Id.* So too here. No party disputes that Grinder broke Brown's right arm with a baton strike. Grinder's testimony that Brown used his right arm to hit Taiariol with a baton and was about to deal a death blow to Taiariol using the same arm provides defendants, in their estimation, with "probable cause to believe that [Brown] pose[d] a significant threat of death or serious physical injury to the officer or others." *See Garner*, 471 U.S. at 3; *see* Mot. at 16-17. But that Brown's right arm indisputably was broken calls into question Grinder's testimony and raises a material question requiring resolution by a jury. *See Newmaker*, 842 F.3d at 1116 ("Summary judgment is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt.").

In short, defendants' qualified immunity argument is dispositive only if this court construes the evidence in a light most favorable to defendants. *See, e.g.*, Mot. at 17 ("Brown was in possession of Taiariol's baton . . . . he continued to be combative up until the time he was shot"); Reply at 13 ("Plaintiffs fail to acknowledge that Grinder only used deadly force against Brown because Brown posed a deadly threat to Taiariol."). To be clear, the court "do[es] not hold that a reasonable jury must find in favor of the plaintiffs on this record, only that it could." *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014). That is enough to preclude summary judgment on the excessive force claim here.

d.     Substantive Due Process

The Ninth Circuit's opinion in *Foster v. City of Indio*, *supra*, and the authority pointed to in that decision, demonstrate it was also clearly established that the defendant officers' conduct here, drawing all reasonable inferences in favor of plaintiffs, violated the protection afforded by substantive due process. The plaintiffs in *Foster*, the decedent's representative and family members, brought both a Fourth Amendment claim to be free from excessive force and a Fourteenth Amendment claim asserting violation of the familial right to association, among others. 908 F.3d at 1209. The facts of *Foster*, which appear to this court to be somewhat more favorable to the law enforcement defendant there than in this case, are as follows. A police officer responded to a 911 call reporting that someone was carrying a gun and walking on a highway in a commercial district. *Id.* at 1207. The officer drove to the location without his sirens on and identified Foster as a person matching the caller's description, at which point he got out of his car; standing within ten feet of Foster, the officer asked him to show his hands and said he needed to talk to him "for a minute." *Id.* at 1207-08. Rather than comply, Foster ran away and the officer followed, shouting at him to stop and show his hands; the officer also "yelled" "Stop or I am going to shoot." *Id.* at 1208. The officer said he could see only Foster's left hand and thought he was "holding something against his body" with his right; he did not see a gun. *Id.* The officer tried to tase Foster without success. *Id.* At a point in the chase when Foster was rounding a corner, the officer testified he shot him, "when he was turning toward him with a gun in his hand." *Id.* The officer's narrative was consistent with that of another police officer who had arrived at the scene and one civilian witness. Three other civilian witnesses offered differing accounts; one changed his story between signing an initial and a second declaration. *Id.* The district court in *Foster* found genuine issues of material fact precluding summary judgment on both Fourth and Fourteenth Amendment claims and denied qualified immunity to the defense. *Id.* at 1209, 1211. The majority of the Ninth Circuit panel found it lacked jurisdiction to reverse the district court's determination because the officer's appeal, properly construed, challenged the sufficiency of the plaintiffs' evidence. *Id.* at 1212-13 (finding analogous the case of *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013), in which "officers used 'the language of materiality,

38

[but] their argument actually [went] to the sufficiency'" of plaintiff's evidence). In its analysis, however, the Circuit observed that "legal standards for plaintiffs' Fourth and Fourteenth Amendment claims are not in dispute." *Id*. at 1211. As relevant here, with respect to the Fourteenth Amendment,

> [I]t has been clearly established since 1998 'that a police officer violates the Fourteenth Amendment due process clause if he kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective.' Legitimate law enforcement objectives include, among others, arrest, self-protection, and protection of the public. A police officer lacks such legitimate law enforcement objectives when the officer 'had any ulterior motives for using force against' the suspect, or when an officer uses force against a clearly harmless or subdued subject.

*Id*. (citations omitted); *see also A.D.*, 712 F.3d at 454 (relied on in *Foster*, stating it was clearly established "[a]fter *Lewis* [a 1998 opinion] and *Moreland* [a 1998 opinion]*,* no reasonable officer could fairly have believed that it was constitutional to shoot a civilian with the subjective purpose to harm unrelated to a legitimate objective").

Here, drawing all reasonable inferences in plaintiffs' favor, in an incident lasting approximately five minutes, a reasonable jury could find Grinder did not shoot and kill Brown based on his stated fear that Brown would seriously injure or kill Taiariol using his right arm, which had been broken. A reasonable jury could instead conclude Grinder, whose partner hurled epithets while trying to subdue Brown, shot and killed Brown with a purpose to harm, without any legitimate law enforcement objective because Grinder used "force against a clearly harmless or subdued subject." *Foster*, 908 F.3d at 1211. It is for a jury to resolve the parties' dispute and thus resolve whether Brown's shooting death evinced a purpose to harm unrelated to legitimate law enforcement objectives. *See again Foster*, 908 F. 3d at 1212-13.

Defendants are not entitled to qualified immunity on the substantive due process claim.

/////

/////

39

4.     Punitive Damages

Defendants assert plaintiffs lack "sufficient evidence for a reasonable jury to conclude that the defendants have acted with malice or oppression" and thus cannot recover punitive damages. Mot. at 23. Plaintiffs respond that "Defendant Officers' conduct of chasing down Luther Brown, severely beating him and shooting him nine times for being an [sic] unarmed and committing a minor traffic violation is sufficiently oppressive conduct warranting imposition of punitive damages." Opp'n at 25.

"It is well-established that a jury may award punitive damages under section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (internal quotation marks, alterations, and citations omitted). Here, the genuine disputes of material fact discussed above preclude the court from ruling as a matter of law that punitive damages are precluded.

5.     Summary

It is fundamental that questions of fact are reserved for the trier of fact. Because the court hears cases in the first instance and presides regularly over jury trials, it has occasion quite often to see citizen juries hard at work. The jury trial is a powerful feature of the constitutional system our founders designed, and it remains available whenever required to serve the critical function of allowing parties to present their grievances for decision on the merits, regardless of the outcome. Plaintiffs have pointed to sufficient evidence to defeat summary judgment on their federal claims and have demanded a jury trial; they are entitled to have a jury, not this court, decide the critical questions of fact underlying their claims. *See* U.S. Const. amend. VII; *see also Tolan*, 572 U.S. at 660 ("The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system.").

Defendants' motion for summary judgment on plaintiffs' federal claims and on punitive damages is DENIED.

/////

B.     State Law Claims

Defendants contend plaintiffs cannot withstand summary judgment on their claims for wrongful death — negligence, violation of California Civil Code section 52.1 (the Bane Act), intentional infliction of emotional distress, or assault and battery. Mot. at 20-23. Defendants primarily argue that these state law claims fail because defendants acted reasonably. *Id.* at 20-21. Plaintiffs for the most part dispute defendants' contentions, except to the extent they concede the state claims of plaintiff Queen E. Brown, decedent's mother, should be dismissed. Opp'n at 22 n.3; *see* Mot. at 22-23.

1.     Wrongful Death—Negligence

To prove negligence, "a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 629 (2013) (alteration in original) (citations omitted). "[D]uty is a critical element of negligence liability." *Id.* The California Supreme Court "ha[s] long recognized that peace officers have a duty to act reasonably when using deadly force." *Id.* (citations omitted). To determine reasonableness, state negligence law, like the Fourth Amendment reasonableness test, requires a consideration of the totality of the circumstances surrounding any use of deadly force. *See id.*

Construing the evidence in a light most favorable to plaintiffs and consistent with the court's reasoning above, a reasonable jury could conclude it was unreasonable for defendants to strike Brown with a baton, punch Brown in the face and shoot him to death in response to Brown's fleeing from officers, attempting to climb a fence and throwing his elbows while face down on the ground as officers struck him.

Defendants also contend "[i]t is undisputed that Grinder shot Brown" and assert "[t]here is no evidence that Brown died from any other cause other than the gunshot delivered by Grinder." Mot. at 20. Thus, "[w]ithout admissible evidence that Taiariol killed Brown, the cause of action for wrongful death against Taiariol fails." *Id.* Plaintiffs assert "[d]efendants are mistaken," arguing "[a] claim of unreasonable force does not depend on whether that allegedly unreasonable force was lethal." Opp'n at 23. The California Supreme Court, while not expressly

addressing the issue, has refused to disturb a jury finding of negligence against two officers where only one defendant officer fatally shot the plaintiff. *Munoz v. Olin*, 24 Cal. 3d 629, 636 (1979). There, the court reasoned the jury could have found both "officers were negligent in identifying" plaintiff as their suspect and "negligen[t] in the failure adequately to warn [plaintiff] and to attempt other means to apprehend him." *Id.* at 636. Further, "[t]he jury could have found negligence on [the shooting officer's] part in interpreting the situation to require shooting at [plaintiff]" and "negligent in the way he used his weapon under the circumstances." *Id.* at 636-37.

Here, construing the evidence in a light most favorable to plaintiffs, the jury could find Taiariol was negligent in failing to issue commands for Brown to stop and surrender. *See* DF 17 (disputed); Velazquez Dep. at 47:19–21, 56:20–57:2; Looney Dep. at 45:20–23, 58:5-19, 70:1–3. The jury could find Taiariol was negligent in using his baton against an unarmed Brown, who was only fleeing from officers. *See* DF 29 (disputed). And, particularly given the undisputed fact that Brown's right arm was broken, the jury could find Taiariol was negligent in unholstering his firearm when, as witnesses testified, Brown had not assumed a fighting stance, held any object in his hands or assaulted the officers. *See* DF 51, 53 (disputed); Velazquez Dep. at 38:10–39:3, 57:3–4, 60:24–62:5; Looney Dep. at 44:16–45:6, 65:14–67:13, 68:5–69:6, 69:15–70:4. The jury could find this "conduct and [these] decisions show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Hayes*, 57 Cal. 4th at 639. As the California Supreme Court has indicated, "state negligence law, which considers the totality of the circumstances surrounding any use of deadly force is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used." *Id.* at 639 (internal citations omitted); *see also Mulligan v. Nichols*, 835 F.3d 983, 991 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 2121 (2017) ("[N]egligence claims under California law encompass a broader spectrum of conduct than excessive force claims under the Fourth Amendment.").

### 2. Bane Act

Defendants do not substantively address plaintiffs' Bane Act claim. Instead, defendants note in passing that plaintiffs' state law claims include a claim for "violation of Civil

42

Code section 52.1 . . . ." Mot. at 20. Defendants then invoke statutory immunities and argue generally, "since the federal claims fail, Plaintiffs' state causes of action also fail." *Id.* at 21. The court addresses defendants' immunity argument below, disposing of the former argument. As discussed above, the federal claims survive, disposing of the latter argument. The court declines to further evaluate the Bane Act or determine whether plaintiffs have made the requisite showing under the Bane Act, particularly where defendants' motion omits any such analysis.

### 3.    Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress (IIED) under California law, a plaintiff must show: "(1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*, 129 Cal. App. 4th 1228, 1259 (2005) (quoting *Trerice v. Blue Cross of California*, 209 Cal. App. 3d 878, 883 (Ct. App. 1989)).

"Conduct is said to be outrageous if it exceeds all bounds of decency; mere insults and indignities may not be sufficient." *Gregory v. City of Vallejo*, 63 F. Supp. 3d 1171, 1181 (E.D. Cal. 2014) (citing *Berkley v. Dowds,* 152 Cal. App. 4th 518, 533 (2007)). "Generally, conduct will be found to be actionable where the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* (quoting *Berkley*, 152 Cal. App. 4th at 533–34). "Whether conduct is outrageous is usually a question of fact." *Ragland v. U.S. Bank Nat. Assn.,* 209 Cal. App. 4th 182, 204 (2012) (citation omitted).

Defendants only briefly address this claim, contending Grinder's and Taiariol's "conduct cannot be characterized as extreme and outrageous" because it was reasonable, and "there is nothing in the record to indicate that Grinder and Taiariol intended to cause Brown emotional or mental harm." Mot. at 22. But the court, as discussed above, has identified a genuine dispute of material fact as to the reasonableness of Grinder and Taiariol's actions.

43

Triable issues of material fact remain as to plaintiffs' excessive force claim, and triable issues likewise remain as to whether the use of force was extreme or outrageous." *See Tekle v. United States*, 511 F.3d 839, 856 (9th Cir. 2007).[20]

### 4. Assault and Battery

Under California law, a claim for battery by a peace officer requires the plaintiff to show: "(1) the defendant intentionally touched the plaintiff, (2) the defendant used unreasonable force to arrest, prevent the escape of, or overcome the resistance of the plaintiff, (3) the plaintiff did not consent to the use of that force, (4) the plaintiff was harmed, and (5) the defendant's use of unreasonable force was a substantial factor in causing the plaintiff's harm." *Pryor v. City of Clearlake*, 877 F. Supp. 2d 929, 952 (N.D. Cal. 2012) (citing Judicial Council of California, Civil Jury Instruction 1305; *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272 (1998)). Accordingly, "[p]laintiff[s] must prove unreasonable force as an element of the tort." *Edson*, 63 Cal. App. 4th at 1273.

Defendants contend that plaintiffs' assault and battery claim fails because Grinder and Taiariol "used reasonable force to detain Brown, prevent Brown's escape, overcome Brown's resistance, and ultimately save Taiariol's life." Mot. at 22. But as reviewed above, a reasonable jury could find defendants' conduct was unreasonable.

### 5. State Law Immunities

Defendants contend multiple state law immunities shield Taiariol and Grinder from liability for plaintiffs' state law claims. Mot. at 21. For instance, defendants cite California Penal Code sections 196 and 835a, contending "[o]fficers are privileged under California law to use reasonable force to make an arrest, prevent an escape, overcome resistance, or otherwise in

---

[20] The Ninth Circuit has held that California law "does not permit recovery for emotional distress upon the death of the person allegedly harmed . . . ." *Martin v. California Dep't of Veterans Affairs*, 560 F.3d 1042, 1051 (9th Cir. 2009) (citing Cal. Code Civ. P. section 377.34) (providing, "[i]n an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, . . . and do not include damages for pain, suffering, or disfigurement"). But because neither party addresses that issue here, the court declines to address it sua sponte.

discharge of their duties." *Id.*; *see* Cal. Penal Code section 196 (providing circumstances where "[h]omicide is justifiable when committed by public officers . . ."); Cal. Penal Code section 835a ("Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape or to overcome resistance."). "The test for determining whether a homicide was justifiable under Penal Code section 196 is whether the circumstances 'reasonably create[d] a fear of death or serious bodily harm to the officer or to another.'" *Martinez v. Cty. of Los Angeles*, 47 Cal. App. 4th 334, 349 (1996) (citations omitted). California courts have held that when the officers' conduct is reasonable for purposes of the Fourth Amendment, that conduct is also reasonable under California Penal Code section 196. *Id.* at 349-50. California Penal Code section 835a likewise permits police officers to use "reasonable force to effect [an] arrest" and thus turns on the reasonableness of the officer's actions. *See, e.g.*, *Edson*, 63 Cal. App. 4th at 1272-73 (noting "police battery actions recognize[]" section 835a's protections by requiring a plaintiff to "prove[] unreasonable force was used").

Accordingly, for the same reasons the court cannot rule as a matter of law in defendants' favor on plaintiffs' Fourth Amendment excessive force claim or plaintiffs' substantive due process claim, the court concludes genuine disputes of material fact preclude finding defendants are immune under California Penal Code sections 196 and 835a. *See, e.g.*, *Mitchell v. City of Pittsburg*, No. C 09–00794 SI, 2013 WL 5487816, at *12 (N.D. Cal. Oct. 1, 2013) (rejecting on summary judgment defendants' section 196 immunity argument where a reasonable jury could find officer used excessive force in shooting decedent); *McMurray v. Cty. of Sacramento*, No. CIV S–092245 GEB, 2011 WL 4709876, at *28 (E.D. Cal. Oct. 4, 2011) (rejecting on summary judgment defendants' section 196 immunity argument because genuine issues of material fact remained as to "whether [the officer's] use of deadly force was reasonable, and whether the circumstances surrounding the incident reasonably created a fear in [the officer] of great bodily injury or death to himself or others"), *adopted as modified in* 2011 WL 5436310, at *1 (E.D. Cal. Nov. 9, 2011); *Lawrence v. City & Cty. of San Francisco*, 258 F. Supp. 3d 977, 998 (N.D. Cal. 2017) (denying summary judgment under section 835a because a

genuine dispute remained as to whether defendant used reasonable force against plaintiff); *Barragan v. City of Eureka*, No. 15-CV-02070-WHO, 2016 WL 4549130, at *6 (N.D. Cal. Sept. 1, 2016) (same).

Defendants also contend California Government Code section 820.2 affords the officers immunity. Mot. at 21. But section 820.2 only applies to policy decisions involving "*deliberate* and *considered* policy decisions," not operational decisions such as "a bus driver's decision not to intervene in one passenger's violent assault against another" or "a police officer's negligent conduct of a traffic investigation once undertaken." *Caldwell v. Montoya*, 10 Cal. 4th 972, 981-82 (1995) (emphasis in original) (citations omitted); *see also Gillan v. City of San Marino*, 147 Cal. App. 4th 1033, 1051 (2007), *as modified on denial of reh'g* (Feb. 21, 2007) ("The decision to arrest [plaintiff] was not a basic policy decision, but only an operational decision by the police purporting to apply the law. The immunity provided by Government Code section 820.2 therefore does not apply."); *Conway v. Cty. of Tuolumne*, 231 Cal. App. 4th 1005, 1015 (2014) (noting "courts have determined discretionary immunity does not apply to . . . using unreasonable force when making an arrest or overcoming resistance to it" (citing *Scruggs v. Haynes*, 252 Cal. App. 2d 256, 264–68 (1967)); *Sharp*, 871 F.3d at 920 (observing as matter of law that section 820.2 immunity "does not apply to an officer's decision to detain or arrest a suspect" and "covers only 'policy' decisions made by a 'coordinate branch[] of government,' not 'operational decision[s] by the police purporting to apply the law'") (quoting *Liberal v. Estrada*, 632 F.3d 1064, 1084–85 (9th Cir. 2011) (alterations in original) (footnote omitted). Section 820.2 does not afford the officers immunity here.

### 6. Summary

Defendants' motion for summary judgment on plaintiffs' state claims is DENIED, with the clarification that the state claims of Queen E. Brown are DISMISSED.

## IV. CONCLUSION

All claims by plaintiff Queen E. Brown except for her Fourteenth Amendment substantive due process claim are DISMISSED. Defendants' motion for summary judgment is DENIED.

46

1          This matter is set for Final Pretrial Conference on **February 28, 2019 at 2:30 p.m.**

2    in Courtroom No. 3.

3          IT IS SO ORDERED.

4    DATED:  January 22, 2019.

5

6    _____
      UNITED STATES DISTRICT JUDGE

7